Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11   LITE-ON IT CORP. and LITE-ON         )    Case No. CV-07-4758-SGL (AJWx)
     (USA) INTERNATIONAL, INC.,           )
12                                        )
             Plaintiffs,                  )
13                                        )
        v.                                )    ORDER GRANTING DEFENDANT'S
14                                        )    MOTION FOR SUMMARY JUDGMENT
     TOSHIBA CORPORATION,                 )    ON PLAINTIFFS' UNFAIR
15                                        )    COMPETITION CLAIM
             Defendant.                   )
16   ─────────────────────────────       )

17          The present motion for summary judgment raises the issue of whether the instant

18   claim for unfair competition is essentially a renewed counterclaim that was settled in a

19   prior lawsuit between the parties.  In the end the Court finds that, although the present

20   unfair competition claim seeks to add one more underlying act (or perhaps, better stated,

21   updates the prior counterclaim to include a post-settlement agreement act), at its base it

22   advances essentially the same legal claim as that settled in the prior lawsuit.  Given that

23   the settlement agreement reached between the parties in the prior lawsuit contained a

24   broad release that would cover such an attempted "update" of the counterclaim from the

25   prior lawsuit, Toshiba's motion for summary judgment on the unfair competition claim is

26   **GRANTED**.

27

28

1

## I. PROCEDURAL POSTURE

2      Toshiba Corporation is the owner of a number of patents covering DVD-ROM &

3 CD-R/RW drives used in personal computers and other media.  As part of its sale of such

4 devices, in 1995 Toshiba was a founding member of the "DVD Forum," an international

5 association of companies engaged in research, development, manufacturing and/or sales

6 of DVDs.  The DVD Forum agreed on the creation of a specification applicable to the

7 recording, production, replication or use of DVDs and related equipment (the "DVD

8 Specifications").  These specifications soon became a technological and commercial

9 necessity for any firm to incorporate into its DVD products if it wished to participate in the

10 DVD market.

11      It is alleged that those members of the DVD Forum with patented technologies

12 relevant to DVDs, including Toshiba, structured the DVD Specifications in such a way as

13 to render compliance with the specification as resulting in the infringement of one or more

14 of the patents owned by a DVD Forum member.  Towards that end it is claimed that, in

15 1999, six members of the DVD Forum, including Toshiba, created a joint licensing

16 program, DVD6C, with each contributing their DVD-related patents utilized in the Forum's

17 DVD Specifications to create a pool of patents which were essential to the design,

18 manufacture, and use of products that incorporate DVD technology.  Any firm wishing to

19 compete in the DVD market were therefore required to secure a license from DVD6C.[1]

20      To assuage any potential anti-trust issues, Toshiba, on behalf of the DVD6C pool,

21 sent a business review letter to the Antitrust Division of the United States Department of

22 Justice ("DOJ") wherein it promised that DVD6C would "license on a non-discriminatory

23 basis to all interested parties" and would "not impose disadvantageous terms on

24

25

26      [1] Thus Toshiba's reference to some of its DVD patents as "essential" while others

27 are "non-essential," depending on whether the patents are necessarily infringed or are not necessarily infringed by DVD products that comply with the published standards or

28 specifications for such DVD products formulated by the DVD Forum and licensed through DVD6C.

1  competitors, let alone refuse to license to them altogether." The DOJ, purportedly based

2  on this promise, deferred on ruling on any anti-trust aspect of the business arrangement.

3      On June 18, 2002, Toshiba filed a complaint against Lite-ON IT Corporation and its

4  United States subsidiary Lite-ON (USA) International, Inc. (collectively "LOIT"), <u>Toshiba</u>

5  <u>Corporation v. Ultima Electronics Corp., et al.</u>, CV-02-4825-SJO (PLAx), Judge Otero

6  presiding, alleging that DVD drives made and sold by LOIT infringed five DVD patents

7  owned by Toshiba.

8      During the course of the litigation, LOIT made it known to Toshiba that it was

9  intending to file a counterclaim against Toshiba based on the alleged anti-trust nature of

10 the DVD6C licensing arrangement. In a letter sent to Toshiba's counsel on March 14,

11 2003, LOIT submitted "a revised draft of a proposed Second Amended Answer,

12 Affirmative Defenses, and Counterclaim," the counterclaim in question being one for

13 "antitrust." In the proposed counterclaim LOIT attempted to assert a litany of anti-trust

14 type claims, namely, for conspiracy in restraint of trade, monopolization, conspiracy to

15 monopolize, and attempted monopolization. The gist of the anti-trust allegation was

16 summed up in the introduction to the proposed counterclaim:

17             This action arises from . . . Toshiba's participation in unlawful
              and anti-competitive agreements to establish technical
18            specifications that control the design, manufacture, replication
              and use of Digital Versatile Discs ("DVDs") and related
19            equipment, and from its conspiracy to eliminate and foreclose
              competition by . . . forming patent pools charging independent
20            producers of products for playing DVDs . . . substantial and
              discriminatory royalties for licenses to DVD technology required
21            to implement those specifications.

22 The proposed counterclaim then recited the history of the DVD Forum, the creation of the

23 DVD Specifications, the subsequent formation of the DVD6C, and the business review

24 letter request before the DOJ.

25     The parties thereafter filed a series of stipulations to extend the time for either party

26 to add parties or claims to the suit. When the parties filed a third stipulation seeking to

27 extend the time to add parties or claims to April 23, 2003, (the original date set in the

28 court's scheduling order being March 31, 2003), the stipulation was denied by the court.

1   Thereafter, LOIT filed a motion to modify the scheduling order, seeking an extension of
2   the deadline to add parties and claims.  LOIT filed its motion to modify the scheduling
3   order so that it would be allowed to file a motion seeking leave to file a proposed Second
4   Amended Answer, Affirmative Defenses and Counterclaims that it had earlier submitted a
5   rough draft of in mid-March to Toshiba's counsel.

6        On June 10, 2003, the court denied LOIT's request to modify the scheduling order
7   to extend the deadline for the parties to add claims and parties, finding that "good cause"
8   did not exist to allow LOIT to modify the scheduling order.  The court concluded that
9   LOIT's reliance on the parties' mutual assent to hold off on filing their motion to amend
10  their pleadings and add parties before the deadline's passage to focus on the ongoing
11  "settlement discussions" was of no moment because admittedly LOIT "could have met the
12  Scheduling Order's timetable" by violating this understanding of counsel and filing the
13  motions before the deadline (considerations of professionalism notwithstanding).  The
14  court next observed that LOIT's subsequent reliance on the stipulation of counsel to
15  further extend the deadline in lieu of filing the motion to amend was not "good cause"
16  because there was always the possibility that the court could deny any stipulation to
17  extend the deadlines, which in fact had happened.  Finally, the court found that allowing
18  LOIT to bring new counterclaims and parties in a complex patent infringement case that
19  had been on its docket for less than a year would prejudice Toshiba and necessitate
20  additional discovery.

21        On July 25, 2003, LOIT and Toshiba executed a Settlement Agreement resolving
22  the suit.  The Settlement Agreement established that LOIT would pay "Toshiba a per unit
23  royalty of the greater of 1.7% of Net Sales and U.S. $1,70" for the use of Toshiba's
24  essential DVD patents.  The Settlement Agreement also provided that, if LOIT entered into
25  a pooled license for essential DVD patents with DVD6C, then LOIT would be entitled to a
26  credit from DVD6C for Toshiba's portion of the DVD6C royalties paid by LOIT.  (Decl.
27  Evan Finkel, Ex. M § 4.3 ("If after the Effective Date LOIT enters a license with the DVD6C
28  Group . . ., LOIT will be entitled to receive a credit for Toshiba's portion of the DVD6C

1  Group royalty amount [that it pays directly to Toshiba pursuant to the terms of the
2  Settlement Agreement]")).

3       This Credit Provision has taken a central role in the present litigation.  LOIT's
4  position is that, during the negotiations leading up to the execution of the Settlement
5  Agreement, Toshiba either expressly or implicitly represented to LOIT that the $1.70 per
6  unit royalty rate was the same rate Toshiba received under the terms of a standard
7  DVD6C license.  (Decl. Wei-Chen Chiu ¶ 5 ("During the [July 14, 2003, Tokyo] meeting,
8  LOIT's counsel specifically advised Mr. Saga[, Toshiba's corporate representative,] that
9  LOIT understood that $1.70 represents Toshiba's share of the royalties that Toshiba was
10  entitled to receive as a member of DVD6C for a standard DVD license.  Mr. Saga said
11  nothing to disabuse us of that understanding.  To the contrary, Mr. Saga remained silent
12  except to announce that the $1.70 figure was non-negotiable" ); Decl. Daniel McClure ¶ 4
13  ("In the course of negotiations, Mr. Finkel[, counsel for Toshiba,] advised me that under
14  the settlement proposed by Toshiba (a) royalty payments to be paid by LOIT for Toshiba's
15  essential patents represented the share of royalties that Toshiba was entitled to receive as
16  a member of the DVD6C Group . . . .  Mr. Finkel explained that it didn't matter to Toshiba
17  whether it received the royalty payments directly from LOIT under the settlement
18  agreement or as a member of the DVD6C Group")).  This point was important as LOIT
19  "would not agree to pay royalties for Toshiba's DVD essential patents" as part of a
20  settlement that were "in excess of the share of royalties that Toshiba was entitled to
21  receive as a member of the DVD6C Licensing Group for a standard DVD license."  (Decl.
22  Wei-Chen Chiu ¶ 4).

23       Also as part of the Settlement Agreement, the parties entered into a mutual release
24  of claims.  LOIT, for its part, agreed to provide Toshiba a release "from any and all claims,
25  liens, demands, causes of action, obligations, losses, damages, and liabilities, known or
26  unknown, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, that
27  they have had in the past or now have or may have in the future based on or arising out of
28  . . . (b) any of the Toshiba Patents including without limitation Toshiba's claims of

infringement . . ., and <u>any counterclaims or defenses to or based on such claims that have</u> <u>been made, have been asserted in proposed amended pleadings or otherwise but not yet</u> <u>added to the Lawsuit by amendment to the pleadings, or that could have been made in the</u> <u>Lawsuit</u>." (emphasis added).

Finally, section 3.1 of the Settlement Agreement provided for the dismissal of the entire action with prejudice, including LOIT agreeing to the dismissal of "any counterclaims or defenses to or based on [Toshiba's patent infringement] claims that have been made, have been asserted in proposed amended pleadings or otherwise but not yet added to the Lawsuit by amendment to the pleadings, or that could have been made in the Lawsuit." Pursuant to the Settlement Agreement, the parties stipulated to, and the court so ordered, the dismissal of the entire action with prejudice "including all counterclaims and defenses" by LOIT.

Afterwards, on January 25, 2005, LOIT was granted a license by DVD6C that was retroactively effective to July 1, 2002. In connection with seeking a DVD6C license, LOIT provided written notice to DVD6C that it sold over 1.3 million units prior to July 1, 2002. On March 17, 2005, DVD6C sent LOIT an invoice for royalties for the 1.3 million DVD units LOIT had sold, indicating a credit of $1.5 million (or approximately $1.11 per unit) for LOIT's payment to Toshiba under the terms of the Settlement Agreement, which was significantly less than the $1.70 per unit royalty rate LOIT had understood to be Toshiba's share of the royalty under a standard DVD6C license (and what had served as the basis for the payment structure under the Settlement Agreement). LOIT asserts that, "[s]hortly after receiving the inadequate credit [from the invoice submitted by DVD6C, it] launched an investigation which was headed by LOIT's outside counsel" and which "was completed in or about February 2007." (Decl. Wei-Chen Chiu ¶ 9). LOIT further asserts that it was not until its outside counsel completed the investigation in February, 2007, nearly two years after receiving the questioned invoice submitted by DVD6C, that it "concluded for the first time . . . that the Settlement . . . Agreement had been procured by fraud." (Decl. Wei-Chen Chiu ¶ 9).

1      In the meantime, on April 10, 2006, LOIT sent a letter to Toshiba's counsel
2 indicating its intent to commence an arbitration proceeding under the compulsory
3 mediation provisions contained in the Settlement Agreement if it was unable to obtain a
4 written agreement with Toshiba presumably concerning the discrepancy in the royalty rate,
5 after the latter's completion of an audit. A couple of months later, on July 25, 2006, LOIT
6 submitted a Notice and Demand for Arbitration, seeking a declaration that the units sold
7 from September 1, 2003, to September 31, 2004, are treated under the normal DVD6C
8 licensing terms instead of those contained in the parties' Settlement Agreement and that
9 such licensing payments be done solely through DVD6C and none paid directly from LOIT
10 to Toshiba.

11      The arbitration proceeded through to a three-day hearing and then concluded with
12 the arbitrator issuing an award in Toshiba's favor, requiring LOIT to pay Toshiba over $10
13 million, plus interest at a rate of 10% per annum from March 31, 2005.

14                                 II. ANALYSIS

15      On June 1, 2007, LOIT brought the present lawsuit in Los Angeles County Superior
16 Court, asserting, among other things, a claim for unfair competition pursuant to California
17 Business and Professions Code section 17200. LOIT's complaint reads much like its
18 proposed counterclaim in the prior lawsuit. It recites the story of the DVD Forum, the
19 Forum's work in creating the DVD Specification, the formation of the DVD6C patent pool,
20 the business letter review request before the DOJ, and the history of the events leading up
21 to the parties' prior lawsuit. (Compl. ¶¶ 7-24). Indeed, the introduction to the complaint
22 covers much of the same and familiar ground (save for one point) ploughed by the
23 proposed counterclaim in the earlier suit: "This action arises from . . . Toshiba's abuse of
24 its position as a member and administrator of DVD6C, a patent pool that controls patents
25 essential to products that incorporate . . . DVD technology. Toshiba prevented [LOIT] from
26 obtaining a standard license from DVD6C so that it could seek royalties from [LOIT] in
27 excess of what it would be entitled to under a standard DVD6C license." (Compl.¶ 6).
28 The one addition being that among the anti-competitive acts LOIT recites in support of its

1  unfair competition claim is Toshiba's conduct during the Settlement Agreement:  "Toshiba

2  used its refusal to grant a [DVD]6C License as leverage to extort a settlement of the

3  Toshiba Lawsuit on terms that were substantially more favorable to Toshiba than what it

4  would have been entitled to as part of the DVD6C Group license."  (Compl. ¶ 25).

5        Thus, in this respect, LOIT's unfair competition claim reveals that, at bottom, it is

6  predicated upon the notion that, even in the absence of fraud, LOIT's assent to the

7  Settlement Agreement was nothing but a manifestation of and an overt act taken in

8  conformity with the anti-competitive nature of the DVD6C pooling arrangement.  That

9  LOIT's assent to the Settlement Agreement was but part and parcel of the overall unfair

10 business practices of Toshiba arising from the critical position it holds in the DVD market

11 due to the DVD Specifications and DVD6C patent pool arrangement is manifested in the

12 substantive paragraph in LOIT's complaint directed to its section 17200 claim: "Toshiba

13 has engaged in a scheme to restrain and injure competition by deceiving [LOIT] with

14 respect to the terms on which licenses under the DVD6C will be granted, by improperly

15 denying [LOIT] a [DVD]6C License on the terms and in the manner that were part-and-

16 parcel of the DOJ approval for DVD6C, and by using this improper denial, and further

17 misrepresentations concerning the DVD6C Group's licensing process and royalty

18 provisions, to obtain excess and improper royalty payments from [LOIT]."  (Compl. ¶ 45).

19       In short, establishing Toshiba's market power is a critical element to LOIT's unfair

20 competition claim; without it, LOIT cannot explain how it came to be that Toshiba was able

21 to generate such a "scheme" to get LOIT to take such a non-standard DVD6C license.

22 Critically, this market power underlaid and was the gravamen of the proposed

23 counterclaims from the prior law suit.  Indeed, the denial of LOIT getting a DVD6C license

24 to begin with before the initiation of the prior lawsuit is stated in LOIT's present complaint

25 as being one of the unfair business practices engaged in by Toshiba. (Compl. ¶ 45

26 ("improperly denying [LOIT] a 6C License on the terms and in the manner that were part-

27 and-parcel of the DOJ approval for DVD6C, and by using this improper denial").

28

1    Not surprisingly, Toshiba argues that the present unfair competition claim is barred

2    by the terms of the release contained in the parties' Settlement Agreement, which

3    specifically barred those "counterclaims . . . asserted in proposed amended pleadings or

4    otherwise but not yet added to the Lawsuit by amendment to the pleadings." As noted

5    earlier, the allegations underlying and the predicate acts giving rise to the present unfair

6    competition claim are exactly the same (save in one respect --- the fraud in inducing LOIT

7    to enter into the Settlement Agreement) to those contained in the proposed anti-trust

8    counterclaims LOIT had drafted in the prior lawsuit.

9    LOIT first responds by arguing that the recitation in the complaint to the earlier

10    allegations found in the proposed counterclaim is nothing more than "background"

11    information to the true gravamen of its unfair competition claim --- Toshiba's commission

12    of fraud in inducing LOIT to enter into the Settlement Agreement. Although the Court can

13    well understand LOIT's efforts to downplay the allegations in its complaint, that is <u>not</u> how

14    the claim is pled in the complaint. The unfair competition claim is pled as being composed

15    of a series of anti-competitive acts by Toshiba in conjunction with the DVD6C and DVD

16    Forum, one of which concerns LOIT's assent to the Settlement Agreement. Far from

17    serving as "background" the history and formation of DVD6C is an absolutely critical part

18    in the unfair competition claim pled by LOIT. It is the claim as pled, not as articulated in

19    the parties' briefs, that the motion is directed toward.[2] In that respect, LOIT's unfair

20    competition claim is built upon and relies nearly exclusively on the recycled allegations

21    contained in its proposed counterclaim in the prior lawsuit. In the Court's judgment the

22    single addition of the fraudulent inducement act does not materially alter the nature of the

23    ─────────────────

24    [2] Although the Court does not pass upon this point in resolving the present motion,
    it has been pointed out in Toshiba's moving papers that insofar as LOIT is seeking to

25    reframe its unfair competition claim as being based exclusively on the fraudulent
    inducement with respect to the Settlement Agreement certain legal hurdles may exist to

26    even that claim being cognizable insofar as it is brought under the fraud prong of section
    17200. <u>See</u> <u>Watson Labs., Inc. v. Rhone-Poulene Rorer, Inc.</u>, 178 F.3d 1099, 1121 (C.D.

27    Cal. 2001) (holding that "there is no case authority that 'fraudulent' business acts are
    separately actionable by business competitiors absent a showing that the public, rather

28    than merely the plaintiff, is likely to be deceived"); <u>National Rural Telecommunications Co-</u>
    <u>op v. Directv, Inc.</u>, 319 F.Supp.2d 1059, 1077-78 (C.D. Cal. 2003) (same).

1  claim being pressed in the present complaint from that being pressed in the prior lawsuit;
2  that LOIT can add but one more anti-trust act to those alleged earlier does not alter the
3  fundamental fact that the present unfair competition claim is nothing more than the
4  proposed anti-trust counterclaim from the prior lawsuit bearing a different legal label.

5       LOIT next responds that, under California law (which the Settlement Agreement
6  contained a provision providing that such law would govern the parties' agreement), a
7  written release only extinguishes any obligation covered by it's terms if it was not obtained
8  by fraudulent means, be it by false representation, concealment, or nondisclosure (a legal
9  point which Toshiba concedes). See Skrbina v. Fleming Co., 45 Cal.App.4th 1353, 1366
10 (1996).  Obviously, the allegation that LOIT was fraudulently induced into entering the
11 Settlement Agreement by Toshiba's misrepresentation, nondisclosure, etc., regarding the
12 true amount it receives under the DVD6C license certainly would call into question
13 enforcement of the release in the Settlement Agreement.

14      Understanding this, Toshiba argues that LOIT's subsequent invocation of seeking
15 arbitration under the Settlement Agreement before it filed the present lawsuit, but after
16 DVD6C had submitted the invoice that gave notice that perhaps the representations made
17 by Toshiba on how much it did receive under a standard DVD6C license was not truthful,
18 constitutes LOIT's acceptance and affirmance of the contract even with knowledge of the
19 fraud.   With that reaffirmation, the release applies.  LOIT does not so much dispute the
20 legal point as it argues that it did not have knowledge of the fraud until February, 2007, a
21 year after it had filed a demand for arbitration under the Settlement Agreement and nearly
22 two years after it had received the invoice in question.  This argument is not persuasive.
23 The notice from DVD6C, showing what Toshiba received under a standard license, was
24 submitted to LOIT in March, 2005, more than a year before LOIT filed its demand for
25 arbitration under the Settlement Agreement in April, 2006.  Even if the Court were to give
26 LOIT the benefit of a doubt and allow it some time to investigate the invoice (it is
27 conceivable that perhaps DVD6C was defrauding LOIT by misrepresenting how much
28 Toshiba received under a standard license thereby increasing DVD6C's share of the

1  payment submitted), LOIT has given no reason for why it would take nearly <u>two years</u> for
2  them to determine that it was Toshiba who had defrauded them as opposed to DVD6C (or
3  someone else) or some other reason for the invoice discrepancy (perhaps an accounting
4  error). LOIT's explanation that "[t]he most [it] could have been aware of in March 2005
5  was perhaps some inconsistency in Toshiba's accounting," (Opp. at 9), rings hollow when
6  LOIT seeks for the Court to believe that it continued to operate under this inconsistent
7  accounting misapprehension for a over a two-year period; at some point, misapprehension
8  must give way to common sense.

9       Certainly, LOIT was not under the same misapprehension a year later, in April,
10 2006. As LOIT itself acknowledges, the March invoice put them on "inquiry notice," (Opp
11 at 9 n.1), so certainly the conduct of such an inquiry over a year's time should have put it
12 at a different knowledge level than where it was in March, 2005. Indeed, the fact that
13 LOIT's July, 2006, Notice and Demand for Arbitration stated as one of its terms that it
14 wished to pay under the standard licensing terms rather than those contained in the
15 Settlement Agreement certainly indicates that by then LOIT had reason to know that the
16 royalty rates under the Settlement Agreement were not the same as those under a
17 standard DVD6C license; why else request such standard payment over that contained in
18 the agreement itself?

19      In support of its position, all the Court is provided is the unadorned statement by
20 LOIT's "legal specialist" that, "[b]ased on the investigation, LOIT concluded for the first
21 time in or about February 2007 that" Toshiba had procured the Settlement Agreement by
22 fraud. (Decl. Wei-Chen Chiu ¶ 9).[3] Mr. Chiu's declaration contains nothing more than a
23 conclusory and unsupported statement as to how long it took for LOIT to conclude that it

24

25      [3] By the same token, however, the Court takes exception to Toshiba's attempt to
26 equate knowledge that the March 2005 invoice pegged Toshiba's royalty share at $1.11
   per unit with knowledge that Toshiba had defrauded LOIT during the settlement
27 negotiations. As noted earlier, perhaps the invoice was a mistake, or perhaps it was
   DVD6C (not Toshiba) that was attempting to short-change LOIT. The point being that
28 some investigation certainly was needed before it could be said that LOIT knew or had
   reason to know that Toshiba had defrauded it.

1   had been defrauded.  Although LOIT's counsel proffered an explanation at oral argument -
2   -- that the length of time in investigating and wrenching the truth of what had happened
3   was due to the opaque nature of DVD6c and its inner workings --- there is no evidence in
4   the record on that point, and the proffered explanation suffers from much of the same
5   flaws as those given by Mr. Chiu:  Long on conclusion and short on facts to support it.
6   Again, nowhere does Mr. Chiu specify specific steps LOIT took in investigating the
7   discrepancy in the invoice nor, more importantly, offer any explanation for why it took two
8   years to "conclude" that LOIT had been defrauded.  Such an assertion is not sufficient,
9   admissible evidence to defeat summary judgment.  See Newman v. County of Orange,
10  457 F.3d 991, 994-95 (9th Cir. 2006) (noting that failure to point to any evidence to
11  support conclusion contained in declaration was insufficient to prevent award of summary
12  judgment).

13         LOIT seeks to get around the knowledge of fraud conundrum by arguing that it is
14  also entitled to rescind the Settlement Agreement and thus escape the effect of the
15  release provision in the same under a theory of mistake; that is, that LOIT mistakenly
16  entered the agreement on the assumption that the portion it was paying to Toshiba was
17  equal to that Toshiba normally received under a standard DVD6C license.  This avenue to
18  rescission, however, suffers from the same one for fraud: It is subject to being re-affirmed
19  by subsequent conduct once the party in question knows of the mistake, which brings the
20  Court back again to the March, 2005, invoice.  Again, the Court would give LOIT some
21  wiggle room after receipt of the invoice before charging it with knowledge of the fraud or
22  mistake, but certainly (and even moreso in the case of a mistake) it would take less than a
23  year to discover that one was mistaken as to how much Toshiba received under a
24  standard DVD6C license.  All that LOIT has offered in support of its "mistake" theory is the
25  problematic conclusory declaration from Mr. Chiu.

26         Finally, LOIT seeks to have the release stricken from the Settlement Agreement,
27  again citing to the fraud purportedly done by Toshiba in securing LOIT's entry into the
28  same.  LOIT cites to a state court decision, Persson v. Smart Inventions, Inc., 125

1   Cal.App.4th 1141 (2005), wherein the court struck a release provision in an agreement

2   due to fraud.  However, as Toshiba correctly notes, all the court in <u>Persson</u> did was strike

3   a portion of the release for <u>unknown claims</u> that were not essential to the agreement.

4   Here, LOIT is seeking to have the Court to strike that portion of the release concerning

5   <u>known claims</u> (namely, those set forth in the proposed counterclaims).  Allowing LOIT to

6   free itself from the terms of the Settlement Agreement that dismissed the claims it sought

7   to bring against Toshiba without allowing the same for Toshiba would result in the creation

8   of a contract that neither side contemplated.  The claims in the release sought to be struck

9   were an essential, bargained-for term.

10          Accordingly, the Court **GRANTS** summary judgment to Toshiba on the unfair

11   competition claim based on the release in the Settlement Agreement and the Court's

12   reading of the nature of the unfair competition claim now being pressed in the complaint

13   and that couched in the proposed counterclaims in the prior lawsuit.[4]

14          IT IS SO ORDERED.

15

16   Dated:  January 6, 2009

17

18                                          STEPHEN G. LARSON
                                            UNITED STATES DISTRICT JUDGE

19

20

21   _____

22      [4] Toshiba has also orally requested that it be given the opportunity to file a second
     motion for summary judgment, notwithstanding the Court's standing order allowing parties

23   but one such motion.  Presently all that is left in this matter is conducting a final pre-trial
     conference on February 9, 2009, and then a 7 to 10 day trial on March 10, 2009.  Toshiba

24   has been aware of being able to file but a single motion for summary judgment for some
     time now.  The Court on June 4, 2008, denied without prejudice the parties' stipulation to

25   being able to file more than one motion for summary judgment.  At that point, Toshiba was
     certainly aware that there was a possibility that it would be forced to adhere to the single

26   summary judgment motion rule.  It could have sought to avoid the consequences of that
     rule by requesting, before filing the present motion two months later on August 18, 2008,

27   the ability to file an over-sized motion.  It chose not to do so.  Given how close this matter
     currently is to trial and given the other avenues that were available to Toshiba to overcome

28   any obstacle created by the single summary judgment motion rule, the Court denies the
     request.

13