O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| LITE-ON IT CORP. and LITE-ON (USA) INTERNATIONAL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>TOSHIBA CORPORATION,<br><br>Defendant. | Case No. CV-07-04758-SGL (AJWx)<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' UNFAIR COMPETITION CLAIM |

The present motion for summary judgment raises the issue of whether the instant claim for unfair competition is essentially a renewed counterclaim that was settled in a prior lawsuit between the parties. In the end the Court finds that, although the present unfair competition claim seeks to add one more underlying act (or perhaps, better stated, update the prior counterclaim to include a post-settlement agreement act), at its base it advances essentially the same legal claim as that settled in the prior lawsuit. Even though the settlement agreement reached between the parties in the prior lawsuit contained a broad release that would cover such an attempted "update" of the counterclaim from the prior lawsuit, there remains an additional complicating wrinkle: Whether the Settlement Agreement (and thus by extension application of the release provision contained therein) was procured by fraud on Toshiba's part, thereby blocking the agreement's terms from barring the present claim. Towards that end, when plaintiff knew or should have known of

that fraud assumes paramount importance to the resolution of the instant motion due to the fact that, subsequent thereto, the plaintiff re-affirmed the Settlement Agreement by invoking its arbitration provisions. Finding that issues of fact on this point remain, Toshiba's motion for summary judgment on the unfair competition claim is **DENIED**.

## I. PROCEDURAL POSTURE

Toshiba Corporation is the owner of a number of patents covering DVD-ROM & CD-R/RW drives used in personal computers and other media. As part of its sale of such devices, in 1995 Toshiba was a founding member of the "DVD Forum," an international association of companies engaged in research, development, manufacturing and/or sales of DVDs. The DVD Forum agreed on the creation of a specification applicable to the recording, production, replication or use of DVDs and related equipment (the "DVD Specifications"). These specifications soon became a technological and commercial necessity for any firm to incorporate into its DVD products if it wished to participate in the DVD market.

It is alleged that those members of the DVD Forum with patented technologies relevant to DVDs, including Toshiba, structured the DVD Specifications in such a way as to render compliance with the specifications as resulting in the infringement of one or more of the patents owned by a DVD Forum member. Towards that end it is claimed that, in 1999, six members of the DVD Forum, including Toshiba, created a joint licensing program, DVD6C, with each contributing their DVD-related patents utilized in the Forum's DVD Specifications to create a pool of patents which were essential to the design, manufacture, and use of products that incorporate DVD technology. Any firm wishing to compete in the DVD market were therefore required to secure a license from DVD6C.[1]

---

[1] Thus Toshiba's reference to some of its DVD patents as "essential" while others are "non-essential," depending on whether the patents are necessarily infringed or are not necessarily infringed by DVD products that comply with the published standards or specifications for such DVD products formulated by the DVD Forum and licensed through DVD6C.

To assuage any anti-trust issues, Toshiba, on behalf of the DVD6C pool, sent a business review letter to the Antitrust Division of the United States Department of Justice ("DOJ") wherein it promised that DVD6C would "license on a non-discriminatory basis to all interested parties" and would "not impose disadvantageous terms on competitors, let alone refuse to license to them altogether." The DOJ, purportedly based on this promise, deferred on ruling on any anti-trust aspect of the business arrangement.

On June 18, 2002, Toshiba filed a complaint against Lite-ON IT Corporation and its United States subsidiary Lite-ON (USA) International, Inc. (collectively "LOIT"), Toshiba Corporation v. Ultima Electronics Corp., et al., CV-02-4825-SJO (PLAx), Judge Otero presiding, alleging that DVD drives made and sold by LOIT infringed five DVD patents owned by Toshiba.

During the course of the litigation, LOIT made it known to Toshiba that it was intending to file a counterclaim against Toshiba based on the alleged anti-trust nature of the DVD6C licensing arrangement. In a letter sent to Toshiba's counsel on March 14, 2003, LOIT submitted "a revised draft of a proposed Second Amended Answer, Affirmative Defenses, and Counterclaim," the counterclaim in question being one for "antitrust." In the proposed counterclaim LOIT attempted to assert a litany of anti-trust type claims, namely, for conspiracy in restraint of trade, monopolization, conspiracy to monopolize, and attempted monopolization. The gist of the anti-trust allegation was summed up in the introduction to the proposed counterclaim:

> This action arises from . . . Toshiba's participation in unlawful and anti-competitive agreements to establish technical specifications that control the design, manufacture, replication and use of Digital Versatile Discs ("DVDs") and related equipment, and from its conspiracy to eliminate and foreclose competition by . . . forming patent pools charging independent producers of products for playing DVDs . . . substantial and discriminatory royalties for licenses to DVD technology required to implement those specifications.

The proposed counterclaim then recited the history of the DVD Forum, the creation of the DVD Specifications, the subsequent formation of the DVD6C, and the business review letter request before the DOJ.

1    The parties thereafter filed a series of stipulations to extend the time for either party
2 to add parties or claims to the suit.  When the parties filed a third stipulation seeking to
3 extend the time to add parties or claims to April 23, 2003, (the original date set in the
4 court's scheduling order being March 31, 2003), the stipulation was denied by the court.
5 Thereafter, LOIT filed a motion to modify the scheduling order, seeking an extension of the
6 deadline to add parties and claims.  LOIT filed its motion to modify the scheduling order so
7 that it would be allowed to file a motion seeking leave to file its proposed Second Amended
8 Answer, Affirmative Defenses and Counterclaims that it had earlier submitted a rough draft
9 of in mid-March to Toshiba's counsel.
10   On June 10, 2003, the court denied LOIT's request to modify the scheduling order
11 to extend the deadline for the parties to add claims and parties, finding that "good cause"
12 did not exist to allow LOIT to modify the scheduling order.  The court concluded that
13 LOIT's reliance on the parties' mutual assent to hold off on filing their motion to amend
14 their pleadings and add parties before the deadline's passage to focus on the ongoing
15 "settlement discussions" was of no moment because admittedly LOIT "<u>could</u> have met the
16 Scheduling Order's timetable" by violating this understanding of counsel and filing the
17 motions before the deadline (considerations of professionalism notwithstanding).  The
18 court next observed that LOIT's subsequent reliance on the stipulation of counsel to further
19 extend the deadline in lieu of filing the motion to amend was not "good cause" because
20 there was always the possibility that the court could deny any stipulation to extend the
21 deadlines, which in fact had happened.  Finally, the court found that allowing LOIT to bring
22 new counterclaims and parties in a complex patent infringement case that had been on its
23 docket for less than a year would prejudice Toshiba and necessitate additional discovery.
24   On July 25, 2003, LOIT and Toshiba executed a Settlement Agreement resolving
25 the suit.  The Settlement Agreement established that LOIT would pay "Toshiba a per unit
26 royalty of the greater of 1.7% of Net Sales and U.S. $1,70" for the use of Toshiba's
27 essential DVD patents.  The Settlement Agreement also provided that, if LOIT entered into
28 a pooled license for essential DVD patents with DVD6C, then LOIT would be entitled to a

credit from DVD6C for Toshiba's portion of the DVD6C royalties paid by LOIT. (Decl. Evan Finkel, Ex. M § 4.3 ("If after the Effective Date LOIT enters a license with the DVD6C Group . . ., LOIT will be entitled to receive a credit for Toshiba's portion of the DVD6C Group royalty amount [that it pays directly to Toshiba pursuant to the terms of the Settlement Agreement]")).

    This Credit Provision has taken a central role in the present litigation. LOIT's position is that, during the negotiations leading up to the execution of the Settlement Agreement, Toshiba either expressly or implicitly represented to LOIT that the $1.70 per unit royalty rate was the same rate Toshiba received under the terms of a standard DVD6C license. (Decl. Wei-Chen Chiu ¶ 5 ("During the [July 14, 2003, Tokyo] meeting, LOIT's counsel specifically advised Mr. Saga[, Toshiba's corporate representative,] that LOIT understood that $1.70 represents Toshiba's share of the royalties that Toshiba was entitled to receive as a member of DVD6C for a standard DVD license. Mr. Saga said nothing to disabuse us of that understanding. To the contrary, Mr. Saga remained silent except to announce that the $1.70 figure was non-negotiable" ); Decl. Daniel McClure ¶ 4 ("In the course of negotiations, Mr. Finkel[, counsel for Toshiba,] advised me that under the settlement proposed by Toshiba (a) royalty payments to be paid by LOIT for Toshiba's essential patents represented the share of royalties that Toshiba was entitled to receive as a member of the DVD6C Group . . . . Mr. Finkel explained that it didn't matter to Toshiba whether it received the royalty payments directly from LOIT under the settlement agreement or as a member of the DVD6C Group")). This point was important as LOIT "would not agree to pay royalties for Toshiba's DVD essential patents" as part of a settlement that were "in excess of the share of royalties that Toshiba was entitled to receive as a member of the DVD6C Licensing Group for a standard DVD license." (Decl. Wei-Chen Chiu ¶ 4).

    Also as part of the Settlement Agreement, the parties entered into a mutual release of claims. LOIT, for its part, agreed to provide Toshiba a release "from any and all claims, liens, demands, causes of action, obligations, losses, damages, and liabilities, known or

unknown, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, that they have had in the past or now have or may have in the future based on or arising out of . . . (b) any of the Toshiba Patents including without limitation Toshiba's claims of infringement . . ., and <u>any counterclaims or defenses to or based on such claims that have been made, have been asserted in proposed amended pleadings or otherwise but not yet added to the Lawsuit by amendment to the pleadings, or that could have been made in the Lawsuit</u>."  (emphasis added).

Finally, section 3.1 of the Settlement Agreement provided for the dismissal of the entire action with prejudice, including LOIT agreeing to the dismissal of "any counterclaims or defenses to or based on [Toshiba's patent infringement] claims that have been made, have been asserted in proposed amended pleadings or otherwise but not yet added to the Lawsuit by amendment to the pleadings, or that could have been made in the Lawsuit." Pursuant to the Settlement Agreement, the parties stipulated to, and the court so ordered, the dismissal of the entire action with prejudice "including all counterclaims and defenses" by LOIT.

Afterwards on January 25, 2005, LOIT was granted a license by DVD6C that was retroactively effective to July 1, 2002.  In connection with seeking a DVD6C license, LOIT provided written notice to DVD6C that it sold over 1.3 million units prior to July 1, 2002. On March 17, 2005, DVD6C sent LOIT an invoice for royalties for the 1.3 million DVD units LOIT had sold, indicating a credit of $1.5 million (or approximately $1.11 per unit) for LOIT's payment to Toshiba under the terms of the Settlement Agreement, which was significantly less than the $1.70 per unit royalty rate LOIT had understood to be what Toshiba's share of the royalty under a standard DVD6C license (and what had served as the basis for the payment structure under the Settlement Agreement).  LOIT asserts that, "[s]hortly after receiving the inadequate credit [from the invoice submitted by DVD6C, it] launched an investigation which was headed by LOIT's outside counsel" and which "was completed in or about February 2007."  (Decl. Wei-Chen Chiu ¶ 9).  LOIT further asserts that it was not until its outside counsel completed the investigation in February, 2007,

nearly two years after receiving the questioned invoice submitted by DVD6C, that it "concluded for the first time . . . that the Settlement . . . Agreement had been procured by fraud." (Decl. Wei-Chen Chiu ¶ 9).

In the meantime, on April 10, 2006, LOIT sent a letter to Toshiba's counsel indicating its intent to commence an arbitration proceeding under the compulsory mediation provisions contained in the Settlement Agreement if it was unable to obtain a written agreement with Toshiba (after Toshiba's completion of an audit) over satisfying the criteria to a separate exclusion to the payment of royalties at the agreement's prevailing rate ---- namely, a cross-license agreement that a joint venture between one of LOIT's subsidiaries and JVC had entered into with DVD6C prior the parties' earlier lawsuit. A couple of months later, on July 25, 2006, LOIT submitted a Notice and Demand for Arbitration, seeking a declaration that the units sold by the LOIT-JVC joint venture be treated under the terms of the cross-license it had entered into with DVD6C instead of the prevailing rate (meaning the $1.70 per unit) contained in the parties' Settlement Agreement, that such licensing payments be done solely through DVD6C, and that none be paid directly from LOIT to Toshiba.

The arbitration proceeded through to a three day hearing and then concluded with the arbitrator issuing an award in Toshiba's favor, finding that the units in question did not satisfy the criteria for the joint LOIT-JVC venture exception to the payment of royalties at the agreement's prevailing rate (again $1.70 per unit) and requiring LOIT to pay Toshiba over $10 million, plus interest at a rate of 10% per annum from March 31, 2005.

## II. ANALYSIS

On June 1, 2007, LOIT brought the present lawsuit in Los Angeles County Superior Court, asserting, among other things, a claim for unfair competition pursuant to California Business and Professions Code section 17200. LOIT's complaint reads much like its proposed counterclaim in the prior lawsuit. It recites the story of the DVD Forum, the Forum's work in creating the DVD Specifications, the formation of the DVD6C patent pool, the business letter review request before the DOJ, and the history of the events leading up

7

to the parties' prior lawsuit. (Compl. ¶¶ 7-24). Indeed the introduction to the complaint covers much of the same and familiar ground (save for one point) ploughed by the proposed counterclaim in the earlier suit: "This action arises from . . . Toshiba's abuse of its position as a member and administrator of DVD6C, a patent pool that controls patents essential to products that incorporate . . . DVD technology. Toshiba prevented [LOIT] from obtaining a standard license from DVD6C so that it could seek royalties from [LOIT] in excess of what it would be entitled to under a standard DVD6C license." (Compl. ¶ 6). The one addition to these otherwise recycled allegations being that among the anti-competitive acts LOIT recites in support of its unfair competition claim is Toshiba's conduct during the Settlement Agreement: "Toshiba used its refusal to grant a [DVD]6C License as leverage to extort a settlement of the Toshiba Lawsuit on terms that were substantially more favorable to Toshiba than what it would have been entitled to as part of the DVD6C Group license." (Compl. ¶ 25).

      Thus, in this respect, LOIT's unfair competition claim reveals that, at bottom, it is predicated upon the notion that, even in the absence of fraud, LOIT's assent to the Settlement Agreement was nothing but a manifestation of and an overt act taken in conformity with the anti-competitive nature of the DVD6C pooling arrangement. That LOIT's assent to the Settlement Agreement was but part and parcel of the overall unfair business practices of Toshiba arising from the critical position it holds in the DVD market due to the DVD Specifications and DVD6C patent pool arrangement is manifested in the substantive paragraph in LOIT's complaint directed to its section 17200 claim: "Toshiba has engaged in a scheme to restrain and injure competition by deceiving [LOIT] with respect to the terms on which licenses under the DVD6C will be granted, by improperly denying [LOIT] a [DVD]6C License on the terms and in the manner that were part-and-parcel of the DOJ approval for DVD6C, and by using this improper denial, and further misrepresentations concerning the DVD6C Group's licensing process and royalty provisions, to obtain excess and improper royalty payments from [LOIT]." (Compl. ¶ 45).

In short, establishing Toshiba's market power is a critical element to LOIT's unfair competition claim; without it, LOIT cannot explain how it came to be that Toshiba was able to generate such a "scheme" to get LOIT to take such a non-standard DVD6C license. Critically, this market power underlaid and was the gravamen of the proposed counterclaims from the prior law suit.  Indeed, the denial of LOIT getting a DVD6C license to begin with <u>before</u> the initiation of the prior lawsuit is stated in LOIT's present complaint as being one of the unfair business practices engaged in by Toshiba.  (Compl. ¶ 45 ("improperly denying [LOIT] a 6C License on the terms and in the manner that were part-and-parcel of the DOJ approval for DVD6C, and by using this improper denial")).

Toshiba argues that the present unfair competition claim is barred by the terms of the release contained in the parties' Settlement Agreement, which specifically barred those "counterclaims . . . asserted in proposed amended pleadings or otherwise but not yet added to the Lawsuit by amendment to the pleadings."  As noted earlier, the allegations underlying and the predicate acts giving rise to the present unfair competition claim are exactly the same (save in one respect --- the fraud in inducing LOIT to enter into the Settlement Agreement) to those contained in the proposed anti-trust counterclaims LOIT had drafted in the prior lawsuit.

LOIT first responds by arguing that the recitation in the present complaint to the earlier allegations found in the proposed counterclaim is nothing more than "background" information that has little to do with the true gravamen of its unfair competition claim --- Toshiba's commission of fraud in inducing LOIT to enter into the Settlement Agreement. Although the Court can well understand LOIT's efforts to downplay the allegations in its complaint, that is <u>not</u> how the claim is pled in the complaint.  The unfair competition claim is pled as being composed of a series of anti-competitive acts by Toshiba in conjunction with the DVD6C and DVD Forum, one of which concerns LOIT's assent to the Settlement Agreement.  Far from serving as "background" the history and formation of DVD6C is an absolutely critical part in the unfair competition claim pled by LOIT.  It is the claim as pled,

not as articulated in the parties' briefs, that the motion is directed toward.[2]  In that respect, LOIT's unfair competition claim is built upon and relies nearly exclusively on the recycled allegations contained in its proposed counterclaim in the prior lawsuit.  This is underscored by the fact that the recycled allegations take up nineteen paragraphs -- spanning three and half pages in the present complaint -- whereas the one dealing with the fraud in the Settlement Agreement takes up only five paragraphs spanning but one and half pages in the complaint.  In the Court's judgment, the addition of the fraudulent inducement act does not materially alter the nature of the claim being pressed in the present complaint from what was pressed in the prior lawsuit; that LOIT can add but one more anti-competitive act (bottomed as it is upon the market position of Toshiba) to those alleged earlier does not alter the fundamental fact that the present unfair competition claim is nothing more than the proposed anti-trust counterclaim from the prior lawsuit bearing a different legal label.

LOIT next responds that, under California law (which the Settlement Agreement contained a provision providing that such law would govern the parties' agreement), a written release will only extinguish any obligation covered by it's terms if it was not obtained by fraudulent means, be it by false representation, concealment, or nondisclosure (a legal point which Toshiba concedes).  See Skrbina v. Fleming Co., 45 Cal.App.4th 1353, 1366 (1996).  Obviously, the allegation that LOIT was fraudulently induced into entering the Settlement Agreement by Toshiba's misrepresentation, nondisclosure, etc., regarding the true amount it receives under the DVD6C license certainly would call into question enforcement of the release in the Settlement Agreement.

---

[2] It has been pointed out by Toshiba that insofar as LOIT is seeking to reframe its unfair competition claim as being based exclusively on the fraudulent inducement with respect to the Settlement Agreement certain legal hurdles may exist to even that claim being cognizable insofar as it is brought under the fraud prong of section 17200.  See Watson Labs., Inc. v. Rhone-Poulene Rorer, Inc., 178 F.3d 1099, 1121 (C.D. Cal. 2001) (holding that "there is no case authority that 'fraudulent' business acts are separately actionable by business competitiors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived"); National Rural Telecommunications Co-op v. Directv, Inc., 319 F.Supp.2d 1059, 1077-78 (C.D. Cal. 2003) (same).  This argument, however, was raised for the first time in Toshiba's reply papers and therefore is deemed waived.  See Daewoo Motor America, Inc. v. Dongbu Fire Ins. Co., 289 F.Supp.2d 1127, 1131-32 (C.D. Cal. 2001).

Understanding this, Toshiba argues that LOIT's subsequent invocation of seeking arbitration under the Settlement Agreement (albeit concerning a different provision in the agreement than the one presently before the Court) before it filed the present lawsuit, but after DVD6C had submitted the invoice that gave notice that perhaps the representations made by Toshiba on how much it did receive under a standard DVD6C license was not truthful, constitutes LOIT's re-acceptance and re-affirmance of the contract even with knowledge of the fraud. With that reaffirmation, the release applies. LOIT does not dispute the legal point, as it argues that it did not have knowledge of the fraud until February, 2007, a year after it had filed a demand for arbitration under the Settlement Agreement and nearly two years after it had received the invoice in question. This argument is not persuasive. The notice from DVD6C, showing what Toshiba received under a standard license, was submitted to LOIT in March, 2005, more than a year <u>before</u> LOIT filed its demand for arbitration under the Settlement Agreement in April, 2006. Even if the Court were to give LOIT the benefit of a doubt and allow it some time to investigate the invoice before charging it with knowledge (it is conceivable that perhaps DVD6C was defrauding LOIT by misrepresenting how much Toshiba received under a standard license thereby increasing DVD6C's share of the payment submitted), LOIT has given absolutely no reason for why it would take nearly <u>two years</u> for them to determine that it was Toshiba who had defrauded them as opposed to DVD6C (or someone else) or some other reason for the invoice discrepancy (perhaps an accounting error). LOIT's explanation that "[t]he most [it] could have been aware of in March 2005 was perhaps some inconsistency in Toshiba's accounting," (Opp. at 9), rings hollow when LOIT seeks for the Court to believe that it continued to operate under this inconsistent accounting misapprehension for a over a two year period; at some point, misapprehension must give way to common sense.

Certainly, LOIT was not under the same misapprehension a year later in April, 2006. As LOIT itself acknowledges, the March invoice put them on "inquiry notice," (Opp at 9 n.1), so certainly the conduct of such an inquiry over a year's time should have put it at a different knowledge level than where it was in March, 2005. However, in support of its

11

position, all the Court is provided is the unadorned statement by LOIT's "legal specialist" that, "[b]ased on the investigation, LOIT concluded for the first time in or about February 2007 that" Toshiba had procured the Settlement Agreement by fraud. (Decl. Wei-Chen Chiu ¶ 9). Mr. Chiu's declaration contains nothing more than a conclusory and unsupported statement as to how long it took for LOIT to conclude that it had been defrauded. Although LOIT's counsel proffered an explanation at oral argument --- that the length of time in investigating and wrenching the truth of what had happened was due to the opaque nature of DVD6C and its inner workings --- there is no evidence in the record on that point, and the proffered explanation suffers from much of the same flaws as those given by Mr. Chiu: Long on conclusion and short on facts to support it. Again, nowhere does Mr. Chiu specify specific steps LOIT took in investigating the discrepancy in the invoice nor, more importantly, offer any explanation for why it took two years to "conclude" that LOIT had been defrauded. Such an assertion is not sufficient, admissible evidence to defeat summary judgment. See Newman v. County of Orange, 457 F.3d 991, 994-95 (9th Cir. 2006) (noting that failure to point to any evidence to support conclusion contained in declaration was insufficient to prevent award of summary judgment).

That LOIT has been unable to come forward with sufficient admissible evidence indicating that it did not know of Toshiba's alleged fraud until after the April, 2006, notice and demand for arbitration does not end the matter. Toshiba is the moving party and, as such, it bears the burden of coming forward with sufficient admissible evidence indicating that LOIT knew or should have known that fact before April, 2006. This Toshiba has not done. The lone piece of evidence submitted by Toshiba in support of its position on this point is the March, 2005, invoice from DVD6C. To Toshiba LOIT's receipt of that invoice and the noted discrepancy contained therein from what was contained in the Settlement Agreement was proof positive (or at least sufficient in and of itself) to charge that LOIT knew or had knowledge of Toshiba's alleged fraud. The Court takes exception to Toshiba's attempt to equate knowledge that the March, 2005, invoice pegged Toshiba's royalty share at $1.11 per unit with knowledge that Toshiba had defrauded LOIT during the

settlement negotiations. As noted earlier, perhaps the invoice was a mistake, or perhaps it was DVD6C (not Toshiba) that was attempting to short-change LOIT. The point remains that <u>some</u> investigation certainly was needed before it could be said that LOIT knew or had reason to know that Toshiba had defrauded it. Thus, the simple fact of receipt of the invoice is not enough to indicate that LOIT knew or had knowledge of the fraud at that time.

In the end, the Court is left with a "factual vacuum" by the parties' evidentiary submissions. Toshiba's March, 2005, invoice is not sufficient to charge LOIT with knowledge of the fraud and, by the same token, Mr. Chiu's bare bones declaration is not enough to absolve LOIT of knowledge of the fraud until well after the April, 2006, notice and demand for arbitration. Given this state of the evidentiary record, the Court is not ina position to award summary judgment on the unfair competition claim on the basis of the release contained in the Settlement Agreement. Until the trier of fact determines when LOIT knew or should have known of the alleged fraud committed by Toshiba in securing LOIT's assent to the Settlement Agreement, the Court cannot determine whether the argument of re-affirmance carries any weight in securing judgment against the unfair competition claim.[3]

LOIT seeks to get around the knowledge of fraud conundrum, by arguing that it is also entitled to rescind the Settlement Agreement and thus escape the effect of the release provision in the same under a theory of mistake; that is, that LOIT mistakenly entered the agreement on the assumption that the portion it was paying to Toshiba was equal to that Toshiba normally received under a standard DVD6C license. This avenue to rescission, however, suffers from the same one for fraud: It is subject to being re-affirmed by subsequent conduct once the party in question knows of the mistake, which brings the Court back again to the March, 2005, invoice, and Mr. Chiu's declaration. Again the Court

---

[3] Given that there exists a fraud/misrepresentation exception to the application of res judicata vis-a-vis the Settlement Agreement, (Opp. at 16), this unresolved factual point also potentially bears on resolution of that point as well.

would give LOIT some wiggle room after receipt of the invoice before charging it with knowledge of the fraud or mistake (thereby undercutting Toshiba's reliance on this evidence for awarding it judgment), but certainly (more so than in the case of a mistake) it should take less than two years to discover that one was mistaken as to how much Toshiba received under a standard DVD6C license, especially when no specific or concrete evidence is submitted proving otherwise (thus undercutting Mr. Chiu's declaration). And again all that LOIT has offered in support of its "mistake" theory is the problematic conclusory declaration from Mr. Chiu.

LOIT then seeks to just have the release stricken from the Settlement Agreement again citing to the fraud purportedly done by Toshiba in securing LOIT's entry into the same. LOIT cites to a state court decision, <u>Persson v. Smart Inventions, Inc.</u>, 125 Cal.App.4th 1141 (2005), wherein the court struck a release provision in an agreement due to fraud. However, as Toshiba correctly notes, all the court in <u>Persson</u> did was strike a portion of the release for <u>unknown claims</u> that were not essential to the agreement. Here, LOIT is seeking to have the Court to strike that portion of the release concerning <u>known claims</u> (namely, those set forth in the proposed, but not accepted for filing by the court, counterclaims). Allowing LOIT to free itself from the terms of the Settlement Agreement dismissing the claims it sought to bring against Toshiba, but not allowing the same for Toshiba, would result in the creation of a contract that neither side contemplated. The claims in the release sought to be struck were an essential, bargained-for term.

Accordingly, the Court **DENIES** awarding summary judgment to Toshiba on the unfair competition claim based on the release in the Settlement Agreement. Until a trier of

fact can determine when LOIT knew or should have known of Toshiba's alleged fraud, the Court cannot gainsay whether the release in the Settlement Agreement would bar the present unfair competition claim.[4]

IT IS SO ORDERED.

Dated: January 7, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

---

[4] Toshiba has also orally requested that it be given the opportunity to file a second motion for summary judgment notwithstanding the Court's standing order allowing parties but one such motion. Presently all that is left in this matter is conducting a final pre-trial conference on February 9, 2009, and then a 7 to 10 day trial on March 10, 2009. Toshiba has been aware of being able to file but a single motion for summary judgment for some time now. The Court on June 4, 2008, denied without prejudice the parties' stipulation to being able to file more than one motion for summary judgment. At that point, Toshiba was certainly aware that there was a possibility that it would be forced to adhere to the single summary judgment motion rule. It could have sought to avoid the consequences of that rule by requesting, before filing the present motion two months later on August 18, 2008, the ability to file an over-sized motion. It chose not to do so. Given how close this matter currently is to trial and given the other avenues that were available to Toshiba to overcome any obstacle created by the single summary judgment motion rule, the Court denies the request.